[No. 53755-1.  En Banc.  November 3, 1988.]

WASHINGTON STATE MOTORCYCLE DEALERS ASSOCIATION, ET AL, *Respondents,* v. THE STATE OF WASHINGTON, ET AL, *Appellants.*

---

*Kenneth O. Eikenberry, Attorney General, Richard A. Heath, Senior Assistant,* and *Ceil Holuk, Assistant,* for appellant State.

*John H. Bright* and *Leonard B. Barson* (of *Keller Rohrback*) and *Robert W. Dickerson* (of *Lyon & Lyon*), for appellant Motorcycle Industry Council.

*Woodring, Bateman & Westbrook,* by *John E. Woodring,* for respondent Washington Motorcycle Dealers Association.

*Kane, Vandeberg, Hartinger & Walker,* by *Elvin J. Vandeberg* and *Clifford D. Foster, Jr.,* for respondent Legislature.

ANDERSEN, J.—

## FACTS OF CASE

The 62nd amendment to the Constitution of the State of Washington sets forth the veto power of the Governor. It provides that a governor "may not object to less than an entire section" of a nonappropriation bill. Const. art. 3, § 12 (amend. 62). We hold that the 62nd Amendment means what it says, and that the Governor's vetoes of less than entire sections of the Motorcycle Dealers' Franchise Act (a nonappropriation bill), enacted at the 1985 regular session, are void.

In 1985 the Legislature passed Engrossed Substitute Senate Bill 3333, the Motorcycle Dealers' Franchise Act.[1] The act as passed by the Legislature contained 15 numbered sections and many more numbered and lettered subsections. The purpose of the act is to regulate relations between motorcycle dealers and motorcycle manufacturers.

On May 21, 1985, Governor Booth Gardner vetoed certain of the language in sections 3(2), 3(8), 3(16), 4(1)(a), 4(1)(b), 4(1)(c), 4(1)(g), 4(7), 4(11), 4(17) 4(18), 4(20), 4(21), 4(22), 4(24), 5(4), 5(5), 8(1), 8(2), and 10, and vetoed all of sections 6, 7, 11 and 12. As partially vetoed, the bill became law (RCW 46.94) on July 28, 1985. The Legislature took no action to override the vetoes.

The Washington State Motorcycle Dealers Association (Dealers) brought an action seeking a declaratory judgment declaring void and unconstitutional all of the Governor's vetoes except for those sections he vetoed in their entirety. Named as defendants were the State of Washington, Booth Gardner, as Governor, and the Motorcycle Industry Council, Inc. (Industry), a trade association of motorcycle manufacturers. The trial court also allowed the Washington State Legislature and two members of the Legislature to join as plaintiff–intervenors.

---

[1]Laws of 1985, ch. 472; Engrossed Substitute Senate Bill 3333, 49th Legislature (1982).

The Dealers and the Legislature moved for summary judgment. After considering briefs and hearing oral argument, the trial court upheld the vetoes of language in sections 3(2), 3(16), 4(7), 4(11), 4(17), 4(18), 4(20), 4(21), 4(22), 4(24), 5(4), 5(5) and 10 as valid exercises of the Governor's power. The court also upheld the Governor's vetoes of sections 6, 7, 11 and 12 in their entirety, and to which no appeal has been taken. The court, however, struck down the Governor's vetoes of language in sections 3(8), 4(1)(a), 4(1)(b), 4(1)(c), 4(1)(g), 8(1), and 8(2) as unconstitutional. The Governor and the Industry appeal the portion of the trial court's order invalidating certain vetoes. The Legislature and the Dealers cross–appeal the portion of the order declaring valid partial vetoes of less than entire numbered sections.

A single issue is dispositive.

## ISSUE

Under Const. art. 3, § 12 (amend. 62), were the Governor's vetoes of parts of numbered sections of the Motorcycle Dealers' Franchise Act[2] valid?

## DECISION

CONCLUSION. We answer the question posed by this issue in the negative. Under the veto powers clause of the constitution in its present form (Const. art. 3, § 12 (amend. 62)), gubernatorial vetoes of less than entire sections of nonappropriation bills are void.

Before the 62nd Amendment was adopted, the veto powers clause of the constitution, Const. art. 3, § 12, provided that the Governor "may object to one or more *sections* or *items*". (Italics ours.) The original text of that section of the constitution is set forth in full in the margin.[3] Legislative bills are ordinarily divided into separate sections

---

[2]*Laws of 1985*, ch. 472.

[3]Original text—Const. art. 3, § 12. "Veto Power—Every act which shall have passed the legislature shall be, before it becomes a law, presented to the governor. If he approves, he shall sign it; but if not, he shall return it, with his objections, to

clearly labeled "Section 1", "Section 2", etc. Presumably for this reason, governors through most of our state's history have generally vetoed entire bills, entire sections and entire appropriation items when exercising their veto powers.[4]

In the 1950's a new trend in the use of gubernatorial partial vetoes emerged, and then in the 1960's and thereafter that trend escalated.[5] This resulted in part from the decisions of this court in *Cascade Tel. Co. v. State Tax Comm'n*, 176 Wash. 616, 30 P.2d 976 (1934) (holding that a "section" in the original Const. art. 3, § 12 would be construed to mean any portion of a bill with separate, distinct and independent subject matter), and *State ex rel. Ruoff v. Rosellini*, 55 Wn.2d 554, 348 P.2d 971 (1960) (holding that an "item" under original Const. art. 3, § 12 was not limited to matters in an appropriation bill). This trend peaked in about 1971–72 when the then Governor exercised 149 partial vetoes on bills passed by the 42nd Legislature, 123 of

that house in which it shall have originated, which house shall enter the objections at large upon the journal and proceed to reconsider. If, after such reconsideration, two–thirds of the members present shall agree to pass the bill it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two–thirds of the members present, it shall become a law; but in all cases the vote of both houses shall be determined by the yeas and nays, and the names of the members voting for or against the bill shall be entered upon the journal of each house respectively. If any bill shall not be returned by the governor within five days, Sundays excepted, after it shall be presented to him, it shall become a law without his signature, unless the general adjournment shall prevent its return, in which case it shall become a law unless the governor, within ten days next after the adjournment, Sundays excepted, shall file such bill with his objections thereto, in the office of secretary of state, who shall lay the same before the legislature at its next session in like manner as if it had been returned by the governor. If any bill presented to the governor contain several sections or items, *he may object to one or more sections or items* while approving other portions of the bill. In such case he shall append to the bill, at the time of signing it, a statement of the section, or sections; item or items to which he objects and the reasons therefor, and the section or sections, item or items so objected to, shall not take effect unless passed over the governor's objection, as hereinbefore provided." (Italics ours.)

[4]Burke, *The Partial Veto Power: Legislation by the Governor,* 49 Wash. L. Rev. 603, 606–07 (1974).

[5]*See* Burke, 49 Wash. L. Rev. at 606–08, 616 (appendix).

which removed less than an entire section from nonappropriation bills, and 26 of which removed less than an entire item from appropriation bills.[6]

In response to the greatly expanded use of the partial veto, the voters were asked to approve the placement of curbs on this power in the state constitution. The proposed changes were submitted to them in 1974 as Senate Joint Resolution 140. The "Statement for" the constitutional amendment in the Official Voters Pamphlet made clear what was intended:[7]

> Washington is the only state in the nation in which the Governor exercises practically unlimited power to remove portions from laws passed by the Legislature. This "item veto" power has been interpreted by recent Governors to apply to any element of a bill down to a single word.
>
> It empowers our Governors to act in effect as an unseparated third house of the Legislature to alter measures substantially prior to signing them into law. This is contrary to the grant of authority allowed our nations' Presidents under the Federal Constitution—which is to reject entire pieces of legislation by veto, not to change them.
>
> *SJR 140 is a moderate compromise proposal passed with bipartisan support. It will not completely eliminate this unparalleled power, but limit it to the veto of sections of bills as well as entire bills, and even provides that budget bills would still be subject to the item veto.*

---

[6]Burke, 49 Wash. L. Rev. at 607.

[7]Statement for Senate Joint Resolution 140, Official Voters Pamphlet (General Election 1974) (part). The bipartisan committee for SJR 140 who were signators of the "for" statement in the Official Voters Pamphlet, were as follows:

"Committee For Senate Joint Resolution 140:

"Harry B. Lewis, State Senator, Republican and Allen Thompson, State Representative, Democrat.

"Advisory Committee: James K. Bender, Executive Secretary, King County Labor Council, AFL–CIO; William E. Burch, Chairman, Association of Washington Business; Henry R. Dunn, Prosecuting Attorney, Cowlitz County; Bruce Helberg, Publisher, the Bellevue American; Blair Patrick, President, Washington Education Association."

(Italics ours.) SJR 140 was adopted by the voters with some 498,745 votes being cast in favor of what is now Amendment 62 to the Constitution of the State of Washington.

The text of Amendment 62 is also set forth in the margin in full.[8] The amendment wrought three things. First, it limited use of the item veto to appropriation bills. Second, it added a new express prohibition against partially vetoing anything less than "an *entire* section" (italics ours) of a nonappropriation bill. And third, it provided the Legislature with authority to reconvene itself into extraordinary session within 45 days after adjournment to override

---

[8]"Every act which shall have passed the legislature shall be, before it becomes a law, presented to the governor. If he approves, he shall sign it; but if not, he shall return it, with his objections, to that house in which it shall have originated, which house shall enter the objections at large upon the journal and proceed to reconsider. If, after such reconsideration, two–thirds of the members present shall agree to pass the bill it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two–thirds of the members present, it shall become a law; but in all such cases the vote of both houses shall be determined by the yeas and nays, and the names of the members voting for or against the bill shall be entered upon the journal of each house respectively. If any bill shall not be returned by the governor within five days, Sundays excepted, after it shall be presented to him, it shall become a law without his signature, unless the general adjournment shall prevent its return, in which case it shall become a law unless the governor, within twenty days next after the adjournment, Sundays excepted, shall file such bill with his objections thereto, in the office of secretary of state, who shall lay the same before the legislature at its next session in like manner as if it had been returned by the governor: *Provided,* That within forty–five days next after the adjournment, Sundays excepted, the legislature may, upon petition by a two–thirds majority or more of the membership of each house, reconvene in extraordinary session, not to exceed five days duration, solely to reconsider any bills vetoed. If any bill presented to the governor contain several sections or appropriation items, he may object to one or more sections or appropriation items while approving other portions of the bill: *Provided, That he may not object to less than an entire section, except that if the section contain one or more appropriation items he may object to any such appropriation item or items.* In case of objection he shall append to the bill, at the time of signing it, a statement of the section or sections, appropriation item or items to which he objects and the reasons therefor; and the section or sections, appropriation item or items so objected to shall not take effect unless passed over the governor's objection, as hereinbefore provided. The provisions of Article II, section 12 insofar as they are inconsistent herewith are hereby repealed. [Amendment 62, 1974 Senate Joint Resolution No. 140. Approved November 5, 1974.]" (Third italics ours.) Const. art. 3, § 12 (amend. 62).

vetoes. The case now before us concerns the second of these three changes, the governor's veto power over entire sections of nonappropriation bills.

All of the arguments supporting the Governor's vetoes of less than full sections of the bill in question in this case boil down to a single conclusion—that when the people wrote into the constitution the limitation that the governor "*may not* object to less than an entire section" of a nonappropriation bill, what they really meant was that the governor *may* object to less than an entire section of such a bill! To adopt this reasoning would skew the state constitution off the course set by the people and violate the basic constitutional precepts that the constitution means what it says, and when it is not ambiguous there is nothing for the courts to construe.[9]

Even were we to consider the 62nd Amendment ambiguous, which it is not, it was directly enacted by the voters and must therefore be read "'. . . as the average informed lay voter would read it.'"[10] There is no reasonable way that "entire section" in the 62nd Amendment could have been read by an informed lay voter as meaning "part of a section".

The importance of the case before us is that it deals directly with one of the cardinal and fundamental principles of the American constitutional system, both state and *federal*: the separation of powers doctrine. "It has been declared that the division of governmental powers into executive, legislative, and judicial represents probably the most important principle of government declaring and

---

[9]16 C.J.S. *Constitutional Law* § 16, at 63 (1984); 16 Am. Jur. 2d *Constitutional Law* § 85, at 411–12 (1979); *Seattle Sch. Dist. 1 v. State,* 90 Wn.2d 476, 500, 585 P.2d 71 (1978); *Anderson v. Chapman,* 86 Wn.2d 189, 191, 543 P.2d 229 (1975); *see also Britton v. Safeco Ins. Co. of Am.,* 104 Wn.2d 518, 528, 707 P.2d 125 (1985) (insurance contract); *PUD 1 v. Public Empl. Relations Comm'n,* 110 Wn.2d 114, 118, 750 P.2d 1240 (1988) (statute).

[10]*Estate of Turner v. Department of Rev.,* 106 Wn.2d 649, 654, 724 P.2d 1013 (1986), quoting *In re Estate of Hitchman,* 100 Wn.2d 464, 467, 670 P.2d 655 (1983).

guaranteeing the liberties of the people, and preventing the exercise of autocratic power, and that it is a matter of fundamental necessity, and is essential to the maintenance of a republican form of government." (Footnotes omitted.)[11] In this same connection, it is also the law that "American courts are constantly wary not to trench upon the prerogatives of other departments of government or to arrogate to themselves any undue powers, lest they disturb the balance of power; and this principle has contributed greatly to the success of the American system of government and to the strength of the judiciary itself." (Footnote omitted.)[12]

In the opinion of the people of the State of Washington, the balance of power between the executive and legislative branches of government had gotten out of kilter, and they reacted directly and forcefully to restore that balance when they adopted the 62nd Amendment. By our opinion herein, we honor the balance of power between the executive and legislative branches that the people struck by adopting the 62nd Amendment, and we will not trench upon that balance under the guise of "interpretation" or "construction". Under our state constitution "[a]ll political power is inherent in the people".[13] The people have now spoken on this issue; therefore, we must abide by their decision and require that the governor veto *entire* sections of nonappropriation bills, not portions of sections. The principal rule of construction we cite in support of this conclusion is the rule of construction provided by the people themselves when they wrote our state constitution:

> The *provisions of this Constitution are mandatory,* unless by express words they are declared to be otherwise.

---

[11]16 Am. Jur. 2d § 296, at 808; *see Seattle Sch. Dist. 1,* at 505–06.

[12]16 Am. Jur. 2d § 309, at 829.

[13]Const. art. 1, § 1.

(Italics ours.) Const. art. 1, § 29.[14] Accordingly, we hold that the constitution mandates voiding all of the Governor's vetoes of parts of sections of the nonappropriation bill before us,[15] and upholding his vetoes of entire sections of the bill (Laws of 1985, ch. 472).[16]

It must be conceded that in the past this court has been less than entirely clear or consistent in favoring our governors with guidelines as to what governors constitutionally can and cannot veto. Originally, this court ruled that the *affirmative–negative test* was to be used. Under that test, the Governor could only exercise the partial veto power in a negative or destructive way, *i.e.,* the veto could only be used to prevent some provision from becoming law, but could not be used to add a new or different result from that which the Legislature intended.[17] That test was formulated about 1910[18] and last applied in 1980 when it was used to uphold the veto of an election provision in a bill creating judgeships.[19] Then in 1984, the court entirely abandoned the test, declaring that it had "outlived its usefulness", was subjective, unworkable and that no one could safely predict whether any given partial veto would be upheld or struck

---

[14]*See Seattle Sch. Dist. 1,* at 500.

[15]The following should thus be declared void:
(1) The partial veto of section 3, subsections 2, 8 and 16;
(2) the partial veto of section 4, subsections 1(a), 1(b), 1(c) and 1(g), 7, 11, 17, 18, 20, 21, 22 and 24;
(3) the partial veto of section 5, subsections 4 and 5;
(4) the partial veto of section 8, subsections 1 and 2; and
(5) the partial veto of section 10.

[16]As the trial court ruled, the Governor validly vetoed sections 6, 7, 11 and 12 in their entirety, but that part of the decision was not appealed from by any party.

[17]*Washington Ass'n of Apartment Ass'ns v. Evans,* 88 Wn.2d 563, 565–66, 564 P.2d 788 (1977).

[18]*Spokane Grain & Fuel Co. v. Lyttaker,* 59 Wash. 76, 86, 109 P. 316 (1910).

[19]*Hallin v. Trent,* 94 Wn.2d 671, 678, 619 P.2d 357 (1980).

down.[20] As the court also explained when it abandoned the affirmative–negative test, it "is an intrusion into the legislative branch, contrary to the separation of powers doctrine, and substitutes judicial judgment for the judgment of the legislative branch." (Citations omitted.)[21]

Another test used by this court in the past to determine the validity of partial vetoes to nonappropriation bills is the *separate subject test,* also mentioned above. Under that test, the focus of the veto is on the subject matter vetoed, with the veto being upheld if the portion vetoed contained separate, distinct and independent subject matter.[22] This test is every bit as vague and uncertain as the affirmative–negative test. As one commentator who recently analyzed this issue recommends:[23]

> Just as it abandoned the affirmative–negative test, the court should abandon the separate subject matter test for a section. Both tests have been relied on when the court has apparently not been comfortable with the constitutional allocation of powers, and the application of either test shifts the constitutional balance of legislative power. Moreover, the separate subject matter test is just as flawed in practical terms as the affirmative–negative test. It is equally difficult to apply and is no more predictable,
> . . .

It is this "separate subject" test which the trial court applied to uphold some of the vetoes of less than full sections of the bill in this case. In deciding whether to perpetuate this test, we heed the words of the learned trial judge who wrestled with the separate subject test in earnestly

---

[20]*Washington Fed'n of State Employees, Coun. 28 v. State,* 101 Wn.2d 536, 546, 682 P.2d 869 (1984).

[21]*Washington Fed'n,* at 546.

[22]*Cascade Tel. Co. v. State Tax Comm'n,* 176 Wash. 616, 619–20, 30 P.2d 976 (1934).

[23]Note, *Washington's Partial Veto Power: Judicial Construction of Article III, Section 12,* 10 U. Puget Sound L. Rev. 699, 713–14 (1987).

endeavoring to apply it in this case. As he candidly declared in his Memorandum Opinion:

*This task has been, frankly, extremely difficult, because of the degree of subjectivity inherent in each determination of what constitutes a separate subject* and, thus, an "entire section." The Court is sympathetic to the argument of plaintiffs that *the "separate subject" test lends itself to line–drawing of a type that renders predictibility [sic] difficult.*

(Italics ours.)

We conclude that there is no longer valid reason to perpetuate an outmoded subjective test like this that renders predictability virtually impossible. When this court recently discarded the "affirmative–negative" test after many years of frustration on the part of all concerned, it leveled a number of criticisms at the test. Each of those criticisms is equally applicable to the "separate subject" test. The "separate subject" test too has outlived its usefulness because it too is "unworkable and subjective", with "no standards to predict"[24] whether any given partial veto will be upheld or struck down; and it "is an intrusion into the legislative branch, contrary to the separation of powers doctrine, and substitutes judicial judgment for the judgment of the legislative branch." (Citations omitted.)[25] We agree with the aforementioned commentator who summed up and recommended as follows:[26]

Court challenges to specific partial vetoes began as early as 1910 and continue to occur today. The Washington Supreme Court has evaluated the constitutionality of partial vetoes both in terms of the express restraints in the constitution and in terms of restraints the court found to be necessarily implied. The tests developed by the court have been difficult to apply. Further, they have not enhanced predictability or efficiency in the legislative

---

[24]*See Washington Fed'n,* at 546.

[25]*Washington Fed'n,* at 546.

[26]10 U. Puget Sound L. Rev. at 702–03.

process. Changes in the partial veto power found in the express language of the 62nd amendment eliminate the need for semantic tests of validity, at least for the section veto power. One such test, the affirmative–negative test, has recently been abolished. The court should do the same with its separate subject test for determining what a "section" is.

(Footnotes omitted.)

We now decline to continue to use either of the subjective semantic tests this court has seen fit to resort to in the past. They are no longer necessary or justified. The 62nd Amendment obviates the need for either of those artificial tests where, as here, vetoes of parts of nonappropriation bills are concerned. Henceforth, should a governor in such situations wish to veto anything in any section, the governor should veto the "entire section" containing the material considered to be objectionable; then the Legislature may or may not attempt to override the gubernatorial veto as it deems fit.

With regard to the anxiety expressed in *Cascade Tel. Co. v. State Tax Comm'n,* 176 Wash. 616, 30 P.2d 976 (1934), that the Governor's veto power over a bill might possibly be frustrated through "the artful arrangement of the subject matter and an arbitrary division into sections,"[27] we fail to see that as a serious problem. Because of the liberal provisions of the veto power that are still contained in the 62nd Amendment, the Governor of the State of Washington is not bound (as the governors of most other states are bound) to veto an entire nonappropriation bill but can simply veto any one or more sections of such a bill which the governor determines to contain objectional provisions. We believe this is obviously what the people meant should henceforth be done when they adopted the 62nd Amendment. It would be an unfortunate alternative for this court to spend the next century of statehood wrestling with one unsatisfactory semantic veto test after another, as it has for much of the first century of statehood, to the continued

---

[27]*Cascade Tel. Co.,* at 619.

frustration of both the executive and legislative branches of state government.

In only one case since the people adopted the 62nd Amendment, with its requirement that the governor "may not object to less than an entire section", has this court followed the "separate subject" test. That was in *Fain v. Chapman,* 94 Wn.2d 684, 619 P.2d 353 (1980) and involved a unique 1–sentence bill creating a number of judgeships. Included within the bill's single sentence was an election date for the new judges. This court applied the "separate subject" test and upheld the veto of the election provision[28] without, to our view, carefully considering or analyzing the new constitutional language delineating the governor's veto power and without reviewing the intent and history of SJR 140. *Fain* does not now prevent this court from abandoning the discredited and no longer necessary "separate subject" test. We have no duty to yield to *Fain* where to do so per-petuates error.[29] As we perceive our obligation, it is to now set the record straight, and declare that when the people adopted the 62nd Amendment in 1974, they said what they meant and meant exactly what they said. We overrule *Fain.* To the extent that overruling *Fain* establishes a new prin-ciple of law, our ruling is prospective only.[30]

We do not in any way fault any governor, past or present, with exercising the veto power to the maximum extent he or she considers appropriate. This is because in the final analysis, "[t]he ultimate power to interpret, construe and enforce the constitution of this State belongs to the

---

[28]*Fain v. Chapman,* 94 Wn.2d 684, 688–89, 619 P.2d 353 (1980).

[29]*See State ex rel. Bloedel–Donovan Lumber Mills v. Savidge,* 144 Wash. 302, 309–10, 258 P. 1 (1927).

[30]In reaching our decision to apply this ruling prospectively only (except as to the instant case), we have given full consideration to the three factors set forth in *National Can Corp. v. Department of Rev.,* 109 Wn.2d 878, 881, 749 P.2d 1286 (1988). *See also In re Marriage of Ortiz,* 108 Wn.2d 643, 647–49, 740 P.2d 843 (1987).

judiciary"[31] and it is the judiciary that has in the past been sending mixed and confusing signals to our governors concerning the manner in which their veto power was to be constitutionally exercised.[32] It is our purpose herein to clear up the confusions of yesteryear and avoid reopening old wounds between the executive and legislative branches of state government or perpetuating the possibility of future misunderstandings between them. The people themselves settled these differences when they adopted the 62nd Amendment in 1974.

For the foregoing reasons, it is necessary to void all of the Governor's vetoes of less than an entire section of the bill before us.

Reversed in part; affirmed in part.[33]

PEARSON, C.J., and BRACHTENBACH, DORE, CALLOW, and DURHAM, JJ., concur.

DOLLIVER, J. (dissenting)—The majority has written an interesting opinion. It begs a fundamental question, makes selective references to amendment 62, adopts a view of the Legislature not supported by history or law, and overturns better than 60 years of precedent while abandoning the prerogative of this court, and all other American courts, to be the interpreter of our constitution.

The approach of this dissent will be twofold: First, it will respond to the position of the majority and demonstrate why I believe it to be in error. Second, following the analysis in *Washington Fed'n of State Employees, Coun. 28 v. State,* 101 Wn.2d 536, 682 P.2d 869 (1984), I will propose a solution to this case which will remove the judiciary from

---

[31]*Seattle Sch. Dist. 1,* at 496.

[32]As the Affidavit of Governor Booth Gardner filed herein explains, his office, "relied upon *Fain v. Chapman,* 94 Wn.2d 684, 619 P.2d 353 (1980) . . ."

[33]See footnotes 15 and 16.

what is essentially a power struggle between the other two branches of government.

## I

Prior to the adoption of amendment 62 by the people on November 5, 1974, those parts of Const. art. 3, § 12 pertinent to this case read as follows: "If any bill presented to the governor contain several sections or items, he may object to one or more sections or items while approving other portions of the bill."

Amendment 62 provides in those parts pertinent to this portion of the dissent:

> If any bill presented to the governor contain several sections or appropriation items, he may object to one or more sections or appropriation items while approving other portions of the bill: *Provided,* That he may not object to less than an entire section, except that if the section contain one or more appropriation items he may object to any such appropriation item or items.

On its face amendment 62 makes two significant changes from the original version of Const. art. 3, § 12: (1) The terms "item" and "items" are modified by the word "appropriation"; (2) while the original constitution simply used the words "section" and "sections" as being subject to veto, amendment 62 provides the veto shall not be exercised on "less than an entire section," except for "appropriation items".

In determining whether the action of the Governor was within the bounds of the constitution, the Court first must determine the meaning of the phrase "less than an entire section," and who is empowered to make that determination. The majority claims there is nothing ambiguous about the term. I disagree.

The court has consistently held the term "section or sections" in the pre–1974 version of article 3, section 12, referred to subject matter rather than to arbitrary divisions. *Cascade Tel. Co. v. State Tax Comm'n,* 176 Wash. 616, 30 P.2d 976 (1934); *Washington Ass'n of Apartment*

*Ass'ns, Inc. v. Evans,* 88 Wn.2d 563, 564 P.2d 788 (1977). As we observed:

> [T]he words "section or sections" as used in the constitution are not always to be limited by the artificial construction of the legislative measure. By the artful arrangement of the subject matter and an arbitrary division into sections, the governor's power might be unduly limited or enlarged without reason.

*Cascade Tel. Co.,* at 619.

In *Fain v. Chapman,* 94 Wn.2d 684, 619 P.2d 353 (1980), in considering the language in amendment 62, we stated:

> When the legislature enacts legislation, it is presumed to be familiar with judicial decisions of this court construing existing statutes and the state constitution. *El Coba Co. Dormitories, Inc. v. Franklin County PUD,* 82 Wn.2d 858, 862, 514 P.2d 524 (1973). From this presumption it follows that the legislature knew, both when it passed the joint resolution which became amendment 62 and when it enacted SSB 3207, that this court had construed Const. art. 3, § 12 and determined that what constitutes an item or a section in legislation is a judicial, not a legislative, question. *See Cascade Tel. Co. v. State Tax Comm'n,* 176 Wash. 616, 30 P.2d 976 (1934). Section divisions made by the legislature in its legislation are entitled to considerable deference and will normally be upheld, but such a result is not inevitable. *Groves v. Meyers,* 35 Wn.2d 403, 213 P.2d 483 (1950).

*Fain,* at 689. Thus, the court has held amendment 62 also is subject to judicial determination as to what constitutes a section in legislation.

The power of the judicial branch of government to be the final authority to interpret, construe, and enforce the constitution is well established. *See The Federalist No. 78* (A. Hamilton) (J. Cooke ed. 1961); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803); *Seattle Sch. Dist. 1 v. State,* 90 Wn.2d 476, 496, 585 P.2d 71 (1978). Without specific and unambiguous instruction from the people in their constitution, this power will not be impaired. The issue then becomes whether there was specific and unambiguous

language in amendment 62 removing the power of interpretation of the phrase "less than an entire section" from the court and giving it to the Legislature.

The majority, apparently, would simply abandon the power of this court to interpret the constitution, relying instead on hortatory references such as "[t]he people have now spoken . . ." (majority, at 675) rather than any reasoned analysis. I disagree with this approach. Not only is it in error in this case, but it establishes a dangerous precedent for future cases involving constitutional interpretation.

Plaintiffs argue the term "less than an entire section," contained in amendment 62 and debated on the Senate floor, indicates the Legislature intended to limit the power of the Governor's veto to "structured" sections. (Parenthetically, it should be said this also appears to be the position of the majority, although this is not specifically stated.) In other words, plaintiffs claim the intention of amendment 62 was to give the Legislature authority to determine what is and what is not a section, binding both the Governor and this court. They specifically urge the court to overrule *Fain v. Chapman, supra.*

In interpreting constitutional amendments, the court must first ask what the people who adopted it understood the meaning to be. The best evidence of voter understanding is the arguments of the proponents contained in the voters' pamphlet which is sent "to each individual place of residence in the state". RCW 29.81.140. *Lynch v. Department of Labor & Indus.,* 19 Wn.2d 802, 812–13, 145 P.2d 265 (1944) ("In determining the meaning of legislation enacted through initiative or referendum, the courts have the right to look to, and may consider, the published arguments made in connection with the submission of such measures to the vote of the electorate. . . . We thus have positive evidence of what the people intended when they voted to adopt the referendum measure."). *See also Whitaker v. Spiegel, Inc.,* 95 Wn.2d 661, 673, 623 P.2d 1147, 637 P.2d 235 (1981).

There is nothing in the voters' pamphlet to suggest the viewpoint of the plaintiffs (or the majority)—in fact, quite the contrary. The crucial words in the Official Voters Pamphlet of 1974, at page 6, are:

SJR 140 is a moderate compromise proposal passed with bipartisan support. It will not completely eliminate this unparalleled power [of the Governor to remove portions from laws passed by the Legislature], but limit it to the veto of sections of bills as well as entire bills, and even provides that budget bills would still be subject to the item veto.

The clear meaning conveyed in the voters' pamphlet is that amendment 62 would (1) eliminate the item veto and (2) allow the veto of sections and entire bills. There is nothing which remotely suggests the power to interpret the meaning of the term "section" should be reposed in the Legislature rather than in the courts. Nor is there anything in amendment 62 which indicates the phrase "less than an entire section" somehow overturned our views expressed in *Cascade Tel. Co. v. State Tax Comm'n, supra,* and left to the Legislature the power to structure "sections" in legislation as it chooses.

Plaintiffs point to a colloquy on the Senate floor as evidence of legislative intent to define the phrase "less than an entire section" as only those sections designated and structured by the Legislature. While the colloquy between Senator Gary Grant and Senator Harry Lewis regarding amendment 62 (then Senate Joint Resolution 140) makes it clear that under amendment 62 the Governor could not veto "less than an entire section," at no place in the Senate or House Journals is there any language which indicates the Legislature intended it would be the final authority on what comprises "an entire section". Senate Journal, 43d Legislature, 3d Ex. Sess. (1974), at 116.

While we could speculate that this was the legislative intent, mere speculation is not enough. *See Spokane v. Taxpayers,* 111 Wn.2d 91, 99, 758 P.2d 480 (1988). If the Legislature had chosen to establish in the constitution the

portion now asserted by the plaintiffs, it could easily have done so. For example, the words "as designated by the Senate and House of Representatives" could have been added after the phrase "less than an entire section". I observe this is the suggestion made by the author of the note in 10 U. Puget Sound L. Rev. 699, 717 (1987), whose article is relied upon by the majority. For whatever reason, this was not done. The legislative history is no more helpful to plaintiffs than is the voters' pamphlet.

In the Senate colloquy Senator Grant, one of the sponsors of amendment 62 (Senate Joint Resolution 140), stated: "Frankly, what we are trying to accomplish is to restore the veto power to the governor as it was understood up until 1959." Senate Journal, at 89. As we have previously stated, in 1959 it was established law under *Cascade Tel. Co. v. State Tax Comm'n, supra,* that it was up to the courts to determine what constituted a section and that this determination was not dependent on the legislative segregation of a bill into sections. When it enacts legislation, the Legislature is presumed to be familiar with judicial decisions of this court construing existing statutes and the state constitution. *Fain v. Chapman, supra* at 689. Add to this presumption the fact that the Senate was acting on advice of counsel (see comments of Senator Grant, Senate Journal, at 116), and that presumption becomes even stronger.

Further examination of the Senate debate makes it apparent the real purpose of amendment 62 (Senate Joint Resolution 140) was to eliminate the item veto, not to give the Legislature sole authority to define sections in a bill. In a colloquy with Senator William Day, Senator Grant stated:

> Up until 1959 it was understood that he [the Governor] could veto appropriations items, but the Constitution does not say 'appropriations item.' All the Constitution says is 'items,' and so Governor Rosellini at the time interpreted that and it was upheld, in the Ruoff case [*State ex rel. Ruoff v. Rosellini,* 55 Wn.2d 554, 348 P.2d 971 (1960)] I believe it was, that 'items' meant a comma, a word, anything.

Senate Journal, at 89. In *State ex rel. Ruoff v. Rosellini,* 55 Wn.2d 554, 348 P.2d 971 (1960), which involved the item veto of the salary of the Governor, the court refused to limit the item veto to appropriations. ("We find no merit in the contention that only an item in an appropriation bill is within the purview of the constitutional provision." *Ruoff,* at 556.) Therefore, it would seem the real thrust of amendment 62—which was accomplished—was to limit the item veto to appropriations.

The majority points to and emphasizes the previously cited language in the voters' pamphlet as supporting its position. Again, I disagree. The analysis the majority puts to this paragraph is stated as follows:

> All of the arguments supporting the Governor's vetoes of less than full sections of the bill in question in this case boil down to a single conclusion—that when the people wrote into the constitution the limitation that the governor "*may not* object to less than an entire section" of a nonappropriation bill, what they really meant was that the governor *may* object to less than an entire section of such a bill! To adopt this reasoning would skew the state constitution off the course set by the people and violate the basic constitutional precepts that the constitution means what it says, and when it is not ambiguous there is nothing for the courts to construe.

Majority, at 674.

While all of this is an excellent rhetorical flourish to show the devotion of the majority to the will of the people, it, of course, completely begs the question. The question is: What is a section? As I have demonstrated, this issue was not faced by the Legislature. It is hornbook law that this court presumes the lawmaking body to be "familiar not only with its own prior legislation relating to that subject, but also with the court decisions construing such former legislation." *Graffell v. Honeysuckle,* 30 Wn.2d 390, 399, 191 P.2d 858 (1948). The debate on the floor of the Legislature illustrates that, in fact, the Legislature was aware of this rule. The Legislature, and the people, were attempting to rid the constitution of the power of a governor to exercise an item

veto on other than appropriations. Amendment 62 success-fully does this. Nowhere in the legislative debates or in the voters' pamphlet, however, is there the slightest indication the words "item" and "section" are somehow synonymous. Yet, this is exactly what the majority would have us believe. The issue is not the elimination of the item veto—that has been done. The issue is who should define a section. That was not done by amendment 62. Thus, it should be up to this court to make that determination.

In a strange passage the majority states:

> Even were we to consider the 62nd Amendment ambiguous, which it is not, it was directly enacted by the voters and must therefore be read "as the average informed lay voter would read it." There is no reasonable way that "entire section" in the 62nd Amendment could have been read by an informed lay voter as meaning "part of a section".

(Footnote omitted.) Majority, at 674. Implicit in the argument of the majority is the patronizing belief that voters cannot possibly be well enough educated to understand or be aware of the issue involving "section" or be aware of or understand the opinions of this court or the debate in the Legislature. Adopting such a gloomy, unwarranted view of the electorate as a basis for our decisions was rejected in the recent case of *Spokane v. Taxpayers, supra.*

There is no doubt but that the approach of this court to the question of defining a section presents difficulties when the court is called upon to settle a dispute between the Legislature and the Governor involving a veto. But it is the role of this court to make difficult decisions involving the interests of contending parties. To turn and run simply because a problem is difficult is unseemly. I would uphold the long–standing position of this court, as most recently expressed in *Fain v. Chapman, supra.* The court then should analyze the vetoes of the Governor and determine whether they are in accord with the rules developed by this court over the past 50 years and which have not been cast aside by amendment 62.

## II

While the approach to this case properly should proceed along the lines I suggest, there is another approach which I also believe to be valid. A significant amount of comment is directed by the majority to the now discredited affirmative–negative veto test. The majority spells out the history of the doctrine and indicates its demise in the case of *Washington Fed'n of State Employees, Coun. 28 v. State,* 101 Wn.2d 536, 682 P.2d 869 (1984). The majority then urges the court to abandon the "separate subject" test for determining sections just as it has abandoned the affirmative–negative test.

*I agree.*

While I do not believe the separate subject test to be as subjective as the affirmative–negative rule, it does lead to involvement by the judiciary in what is essentially a battle between the Legislature and the Governor. I welcome the abandonment of this burden to those branches of government involved in the controversy if it can be done without unduly harming the authority of the judiciary to interpret the constitution. I believe the approach I propose, which was foreshadowed in *Washington Fed'n of State Employees, Coun. 28 v. State, supra,* will accomplish this goal.

If the separate subject test is to be abandoned, however, the court should leave the parties as equal contenders and not tip the scales in favor of one side or the other. Certainly the allocation and exercise of political power is the purpose of constitutions. The power is allocated by the people through their constitution to be exercised by the government which derives its power from the people. In the case of amendment 62 the people adopted a scheme whereby the two contending branches of government can settle the veto dispute in an orderly manner, without the intervention of the judiciary or without the judiciary, as the majority does here, giving an advantage to one side or the other.

Amendment 62 provides that:

[W]ithin forty–five days next after the adjournment, Sundays excepted, the legislature may, upon petition by

a two–thirds majority or more of the membership of each house, reconvene in extraordinary session, not to exceed five days duration, solely to reconsider any bills vetoed.

Thus, if the Legislature disagrees with the Governor's vetoes, it may call itself back into special session to correct the perceived defect. If the Governor feels the Legislature has improperly designated a section, *see Cascade Tel. Co. v. State Tax Comm'n, supra,* that subject which the Governor believes to be a separate section may be vetoed. If the Legislature disagrees, it may call itself back into session to rectify the perceived error. That is the constitutional structure, adopted by the people of this state. As we observed in *Washington Fed'n of State Employees, Coun. 28 v. State, supra* at 547:

While it may be argued it is difficult for the Legislature to obtain the two–thirds concurrence to call itself into a special veto session or override a veto, these constitutional arrangements are for the people to determine, not this court. If these arrangements become unsatisfactory or subjected to abuse, the people are capable of making desired changes.

This stands in marked contrast to the situation prior to amendment 62 when only the Governor could call the Legislature into any kind of special session. Const. art. 3, § 7.

Essentially, the difference between the majority and the dissent is that while the majority would give the Legislature the power to make the final determination as to what was a "section" thereby overturning over 50 years of judicial interpretation and finding legislative intent where none can be shown, I would recognize the meaning of the term "section" is one of continuing dispute, both on this court and in the other two branches of government. Rather than tilt the scales in favor of one branch over the other, I would allow them to follow the constitutional scheme, passed by the Legislature and adopted by the people. Since, in this case,

the Legislature failed to exercise its constitutional prerogative and call itself back in session to deal with the Governor's vetoes, I would reverse in part the holding of the trial court and affirm all of the Governor's vetoes.

UTTER, J., concurs with DOLLIVER, J.